### 6439. RANDOLPH *v.* THE STATE.

1. Where an indictment charging larceny of seed-cotton alleges joint ownership in two persons, proof that one of them was the landlord and the other was his cropper, but that all advancements made to the cropper by the landlord in the year in which the seed-cotton was raised were fully paid, and that at the time of the larceny they were each entitled to an undivided half interest in the cotton, which was then in the possession of the cropper, would sufficiently sustain the allegation of joint ownership; for while the legal title is vested by law in the landlord until "he has received his part of the crops so raised, and is fully paid for all advances made to the cropper in the year said crops were made to aid in making the said crops" (Civil Code, § 3706), the cropper has such an interest therein as will sustain an allegation as to his joint ownership of the stolen property.
2. The evidence was wholly circumstantial and did not exclude every other reasonable hypothesis than that of the guilt of the accused.

DECIDED MAY 10, 1915.

Indictment for misdemeanor; from Laurens superior court—Judge Kent. February 24, 1915.

*W. C. Davis,* for plaintiff in error.

*E. L. Stephens, solicitor-general,* contra.

WADE, J. 1. In a prosecution for larceny, the value of the stolen property must not only be alleged and proved, but the ownership thereof must be laid (if known) in some person or persons (*Buffington* v. *State,* 124 *Ga.* 24, 52 S. E. 19), or if the owner be unknown, this fact must also be alleged (*Stringfield* v. *State,* 25 *Ga.* 476; *Thomas* v. *State,* 96 *Ga.* 311, 22 S. E. 956), and an indictment in which the ownership of the goods alleged to have been stolen is laid in a partnership, without alleging the names of the partners composing the firm, is fatally defective. *Buffington* v. *State, supra.* A special property coupled with lawful possession

has been held sufficient to support an allegation of ownership (*Robinson* v. *State,* 1 *Ga.* 563); and where property is fraudulently taken and carried away from the possession of one holding it as a pledgee for security, the pledgee has such a special property in the pledge as authorizes a conviction under a charge of stealing property belonging to him. *Henry* v. *State,* 110 *Ga.* 750 (36 S. E. 55, 78 Am. St. R. 137). It is well settled that ownership may be laid in a gratuitous bailee (*Wimbish* v. *State,* 89 *Ga.* 294, 15 S. E. 325), and also that a carrier has such an interest in goods in its custody for transportation as to support the allegation of its ownership in an indictment for larceny or burglary (*Hall* v. *State,* 7 *Ga. App.* 115, 66 S. E. 390); and the ownership may be laid in the person having lawful possession of the property, though he holds it as the agent or bailee of another. *Bradley* v. *State,* 2 *Ga. App.* 622 (58 S. E. 1064). It is said in 25 Cyc. 91, that "Any legal interest in the goods, although less than the absolute title, will support an allegation of ownership. But there must be an actual legal interest, not a mere claim or expectation of interest. . . The ostensible ownership is, however, enough to justify the description. So far as the thief is concerned, he can not question the title of the apparent owner."

Under the law of Georgia (Civil Code, § 3705), whenever the relation of landlord and cropper exists, the title to the crops grown and raised upon the lands of the landlord by the cropper is vested in the landlord until he has received his part of the crops so raised, and is fully paid for all advances, made to the cropper in the year they were raised, to aid in making the crops. Nevertheless, the cropper has an interest in the crop raised by him, though it be not such an interest as he could assert in an action of trover, or against his landlord except in a certain limited way; for section 3707 of the Civil Code declares that "The title to the crop, *subject to the interest of the cropper therein,* and the possession of the land remain in the owner." It has been held that the cropper "has a property interest in the growing crop," which he may mortgage. *Fountain* v. *Fountain,* 7 *Ga. App.* 361 (66 S. E. 1020). See same case, 10 *Ga. App.* 758 (73 S. E. 1096). Also, it is well settled that the cropper may foreclose his laborer's lien against the landlord for his part of the crop after rent and advances are paid (*McElmurray* v. *Turner,* 86 *Ga.* 215, 12 S. E. 359; *Lewis* v. *Owens,* 124

*Ga.* 228, 52 S. E. 333; *Garrick* v. *Jones,* 2 *Ga. App.* 382, 58 S. E. 543); from which it is clearly deducible that the cropper has a limited interest in the crop raised by him on the premises of his landlord. And we hold such interest to be sufficient to sustain an allegation of joint ownership with his landlord, where the testimony shows, as appears in this case, that all advances due by the cropper to the landlord had been fully paid off, and the remaining cotton yet in the possession of the cropper, including that alleged to have been stolen, belonged jointly and equally to the landlord and the cropper.

2. The evidence for the State showed that on or about December 25, 1914, about 100 pounds of seed-cotton was lost, or disappeared, from a cotton-basket, which had been left in the field rented from some one else by Dan Morman and in the possession of his cropper Ennis Johnson, who worked with him on halves. The cotton was taken at night, and on the following day tracks were discovered, leading from the cotton-basket, in the field, directly towards the house of the defendant. The landlord and the cropper who owned the cotton went to the house of the accused, accompanied by Mr. Keen, a white neighbor, the defendant's shoes were carefully examined, and it was found that "his shoe-bottom and the sole of his shoe was broken and made a track identically the same as the ones that were there that we traced towards Jim Randolph's house; the shoe was kinder run down too," and the "left shoe was turned over further than the right one." The defendant was requested to place his feet, with the worn shoes thereon, in the tracks, and readily did so, when it was seen that his shoes fitted the tracks exactly. The tracks, however, did not come to the defendant's house, but stopped at a point about 75 or 100 yards from the house. The defendant-stated at the time that he knew nothing about the tracks, though he admitted that the shoes he had on and which were compared with the tracks were the only shoes he possessed; and he said, when told that some cotton was missing, that he did not have any cotton, but there was found in his house a pile of cotton which he then said belonged to his father-in-law, Ben Wilson. The evidence showed that the defendant's house was only about a quarter of a mile from the place in the field where the basket from which the cotton had been stolen was found, that his father-in-law, Ben Wilson, was farming about a mile dis-

tant from the defendant's house, and that there were "four, five, or six hundred pounds" of seed-cotton discovered in the house. It further appeared, from the "indications," that the missing cotton had been taken out of the basket, and "the tracks led towards the defendant's house; there were locks of cotton, and the tracks that led back towards the defendant's house." Wilson, the defendant's father-in-law, testified that the house in which he lived was closer to the point where the witnesses for the State said they "stopped tracking" than the defendant's house was. He testified that he did not see any tracks, but he saw where the party investigating the matter stopped tracing tracks. He further testified, that he knew nothing as to any cotton that the accused may have had in his house, but he himself had some there; that as he picked it he put it there; that there was a bale of cotton in that house at the time which belonged to him; that he permitted the defendant to occupy one large room in this house belonging to him, and kept his cotton in a smaller room in the same house, and that he had cotton in this room before the defendant moved into the house, and that the house he occupied himself was only about 20 steps from the defendant's house. On cross-examination he admitted that he did not remember exactly how much cotton he had in the small room of the house occupied by the defendant, and that he did not "know whether Jim [the defendant] could have put 100 pounds in there and me not know of it." There was testimony tending to show that the defendant was at church four miles away, about 10 or 11 o'clock, and left at that hour, and went off in the direction of his home. And the accused himself stated that he did not start home from church until about 2 o'clock, as he remained after services to talk to his presiding elder, the witness who testified he left at 10 or 11 o'clock. This last evidence is, however, immaterial, since there is nothing to show when the cotton was stolen, and, even according to the defendant's statement, he had ample time after 2 o'clock to reach home and carry the cotton to his house before the night was entirely gone. There was also evidence to show the bad state of feeling entertained by the landlord Morman and his cropper Johnson towards the accused; and Morman testified that when the tracks going away from the basket of cotton were compared with the tracks made by the accused, the latter remarked that "old shoes would condemn you sometimes;" but whether this remark was made face-

tiously, or to indicate a fear that *his* old shoes might unjustly bring suspicion upon him, does not appear; and there is nothing to suggest that this remark was intended as a partial confession, or to make it necessarily an incriminatory admission. The evidence disclosed that around the basket in the field there were other tracks, which a witness said had been made by the cotton-pickers; and this witness further explained that the only persons picking cotton in the field were Ennis Johnson and a woman, and that Ennis wore a very large shoe, about a number 11 or 12, whereas the evidence showed that the tracks leading from the basket to the defendant's house were apparently made by "about" a number 9 shoe, and the defendant claimed in his statement that he wore a number 7 shoe, but there was no testimony to substantiate his statement. The evidence disclosed further that it was not necessary for the accused to come through the field by the basket from which the cotton was stolen, to reach his house in returning from the church which he claimed he had attended on the night the cotton was stolen, but, on the contrary, it appeared that another route was more direct.

However, when we come to review the entire case, it will be seen that the only facts connecting the accused with the commission of the alleged crime were the tracks identified as his, leading from the basket in the direction of the house, and some locks of cotton which appeared to have dropped along the way. No part of the cotton found in his house was identified by any witness as all or a part of the stolen cotton, nor did any witness dispute the testimony of Wilson to the effect that all the cotton in the house of the accused was the property of Wilson, or that he had as much cotton belonging to him as was found in that house. It is true, Wilson said he could not of his own knowledge assert whether the accused had placed in that room any cotton besides his own, but this admission on his part did not establish that there was in the defendant's house one pound of cotton not claimed by Wilson or not belonging to him. The evidence relating to the tracks tended very strongly to establish that they were made by shoes belonging to the accused, and probably on the night when the crime was committed, but as held in the *Cummings* case, 110 *Ga.* 293 (35 S. E. 117), where tracks were relied on to connect the accused with the crime, and tracks were seen near the place of the crime, which must have been made on the night it was committed, and "corresponded in minute

particulars with shoes belonging to the accused, this, without more, was not sufficient to show, to the exclusion of every other reasonable hypothesis, that he committed the crime." In the case of *Wade* v. *State,* ante, 163 (84 S. E. 593), in which a conviction of arson was sustained, the conviction depended largely upon proof of tracks leading to the burned barn, and away from the barn back to the house of the accused, but there were various other circumstances in that case, among which was the fact that strong threats were shown to have been made by the accused against the owner of the burned barn, and there was clear evidence of a desire for revenge on his part for some real or imaginary injury. It is true that where one steals the property of another, the acquisition of the property or his prospective use or enjoyment thereof furnishes a sufficient motive, if it be shown, for instance, that he was in the possession of the stolen property soon after the theft or under circumstances indicating an intent to appropriate it to his own use; but on the other hand (violent as the presumption may sometimes be), all men are presumed to be honest until the contrary is shown, and we can not assume that the defendant had a motive for taking cotton belonging to another, until we show that he actually did take it, or was fraudulently in possession of it, or some similar facts and circumstances appear.

The defendant's denial that he had any cotton before he ascertained that a search was imminent looks suspicious, but, on the other hand, what more natural than his assertion that he had no cotton, when he had just been acquainted with the fact that seed-cotton belonging to his known enemies (according to some of the proof) was missing, and that they and the white man with them were in search of the thief. His denial may have been made in good faith and may have been intended to mean only that he personally had no cotton in the house occupied by him, or it may be that he did not at the time recall that his father-in-law had cotton in the small room attached to that part of the house occupied by him, or, as already suggested, he may have feared to admit that there was any cotton in the house, even though he was perfectly innocent, and may have resorted to a lie in the hope that no search would be made of the premises. Likewise, the embarrassment which one witness testified the defendant displayed, when they approached his house the morning after they discovered the crime,

may be suggestive of guilt; or, on the other hand, it may have arisen because of natural apprehension excited in his mind from observing the approach of several men, two of whom were his enemies, and have been aroused by a lively fear of danger to himself when the loss of cotton belonging to his enemies was mentioned to him and it was suggested that the party was in search of the thief.    There was also some evidence as to the defendant's good character, and there is nothing to prevent the reasonable supposition that he may have gone out of his direct route in returning from church, and in fact may have passed by the cotton-basket, and even idly and thoughtlessly picked up a handful of cotton and carelessly dropped it as he walked along from there to his house. A hundred other conjectures might be made, but enough is suggested above to indicate that the circumstantial evidence was not sufficient to exclude every other reasonable hypothesis than that of the guilt of the accused; and while it is true the jury are the judges in questions of fact, yet, nevertheless, we can not evade the duty resting upon us to set aside a verdict which fails to come strictly up to the requirements of law; and it is clear to us that the requirements of law as to circumstantial evidence were not met by the circumstances in proof in this case.    The defendant may be guilty, but this does not concern us, for if he be not *legally* guilty, or, in other words, guilty under the rules of law prescribed for the protection not only of society at large, but of the individual as well, his conviction would be unauthorized.

The trial judge erred in overruling the motion for a new trial.

*Judgment reversed.*